# Morris, Nichols, Arsht & Tunnell

1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347

302 658 9200
302 658 3989 Fax

Megan Ward Cascio
302 575 7364
302 498 6214 Fax
mcascio@mnat.com

March 17, 2005

```
┌─────────────────────────┐
│      REÇU LE            │
│   2 5 MARS 2005         │
│        CDR              │
│   Direction Juridique   │
└─────────────────────────┘
```

**INTERNATIONAL REGISTERED MAIL**
**RETURN RECEIPT REQUESTED**

Consortium de Realisation S.A.
3-5 Rue St. Georges
Paris 75
France 75009

Re:    AIG Retirement Services, Inc. v. Altus Finance S.A., et al.

Dear Sir/Madam:

This letter constitutes notice under 10 Del. C. § 3104 that suit has been instituted against Consortium de Realisation S.A. in the Court of Chancery of the State of Delaware in and for New Castle County. Enclosed is a copy of the Summons, Complaint, Motion for Appointment of Special Process Server and Supplemental Information Statement.

Please be advised that the original Summons and Complaint have been served upon the Secretary of State for the State of Delaware in lieu of personal service upon Consortium de Realisation S.A. and that under the provisions of 10 Del. C. § 3104 such service is effective for all intents and purposes as if it had been made upon Consortium de Realisation S.A. personally within the State of Delaware.

Sincerely,

*Megan Cascio*

Megan Ward Cascio

Enclosures

456093

# MORRIS, NICHOLS, ARSHT & TUNNELL

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347

302 658 9200
302 658 3989 FAX

MEGAN WARD CASCIO
302 575 7364
302 498 6214 FAX
mcascio@mnat.com

March 17, 2005

**INTERNATIONAL REGISTERED MAIL**
**RETURN RECEIPT REQUESTED**

```
RECU LE
2 5 MARS 2005
CDR
Direction Juridique
```

Altus Finance S.A.
3-5 Rue St. Georges
Paris 75
France, 75009

Re:    AIG Retirement Services, Inc. v. Altus Finance S.A., et al.

Dear Sir/Madam:

This letter constitutes notice under 10 <u>Del. C.</u> § 3104 that suit has been instituted against Altus Finance S.A. in the Court of Chancery of the State of Delaware in and for New Castle County. Enclosed is a copy of the Summons, Complaint, Motion for Appointment of Special Process Server and Supplemental Information Statement.

Please be advised that the original Summons and Complaint have been served upon the Secretary of State for the State of Delaware in lieu of personal service upon Altus Finance S.A. and that under the provisions of 10 <u>Del. C.</u> § 3104 such service is effective for all intents and purposes as if it had been made upon Altus Finance S.A. personally within the State of Delaware.

Sincerely,

Megan Ward Cascio

Enclosures

455842

SUPPLEMENTAL INFORMATION PURSUANT TO RULE 3 OF THE RULES OF THE COURT OF CHANCERY

Filed Jan 14 2005 10:48PM EST
FILING ID 4955927

The information contained herein is for the use by the court statistical and administrative purposes only. Nothing stated herein shall deemed an admission by or binding upon any party.

1. Caption of Case: AIG RETIREMENT SERVICES, INC. (formerly known as SunAmerica Inc.), derivatively on behalf of NEW CALIFORNIA LIFE HOLDINGS, INC., a corporation organized under Delaware law, and AURORA NATIONAL LIFE ASSURANCE COMPANY, a stock insurance company under California law; Plaintiff, v. ALTUS FINANCE S.A., a corporation organized under French law; AURORA, S.A., a corporation organized under French law; CDR ENTERPRISES, a corporation organized under French law; CONSORTIUM DE REALISATION S.A., a corporation organized under French law; MAAF ASSURANCES, a mutual insurer organized under French law; MAAF VIE S.A., a corporation organized under French law; CRÉDIT LYONNAIS S.A., a corporation organized under French law; ARTÉMIS, S.A., a corporation organized under French law; ARTÉMIS FINANCE S.N.C., an entity doing business under French law; and FRANCOIS PINAULT, an individual, Defendants, and AURORA NATIONAL LIFE ASSURANCE COMPANY, a stock insurance company under California law; and NEW CALIFORNIA LIFE HOLDINGS, INC., a Delaware corporation,

2. Date filed: January 14, 2005

3. Name and Address of counsel for plaintiff:

Kenneth J. Nachbar (#2067)
Megan Ward Cascio (#3785)
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347

4. Short Statement and nature of claim asserted: Derivative causes of action related to a conspiracy of fraud and deceit including breaches of contract and aiding and abetting breaches of fiduciary duty.

5. Substantive field of law involved (check one):

☐ Administrative law
☐ Commercial law
☐ Constitutional law
☒ Corporation law
☐ Guardianship
☐ Labor law
☐ Real Property
☐ Trade secrets/ trade mark/or other intellectual property
☐ Trusts
☐ Wills and estates
☐ Zoning
☐ Other

6. Related case(s): AIG Retirement Services, Inc., et al v. Patricia Barbizet, et al, C.A. No. 974

7. Basis of court's jurisdiction (including the citation of any statute conferring jurisdiction): 10 Del. C. § 341

8. If the complaint seeks preliminary equitable relief, state the specific preliminary relief sought:

9. If the complaint seeks summary or expedited proceedings, check here ☐.

Megan Cascio

Signature of Attorney of Record
Megan Ward Cascio (#3785)

EFiled: Jan 14 2005 10:48PM EST
Filing ID 4955927

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| AIG RETIREMENT SERVICES, INC. (formerly known as SunAmerica Inc.), derivatively on behalf of NEW CALIFORNIA LIFE HOLDINGS, INC., a corporation organized under Delaware law, and AURORA NATIONAL LIFE ASSURANCE COMPANY, a stock insurance company under California law; <br><br> Plaintiff, <br><br> v. <br><br> ALTUS FINANCE S.A., a corporation organized under French law; AURORA, S.A., a corporation organized under French law; CDR ENTERPRISES, a corporation organized under French law; CONSORTIUM DE REALISATION S.A., a corporation organized under French law; MAAF ASSURANCES, a mutual insurer organized under French law; MAAF VIE S.A., a corporation organized under French law; CRÉDIT LYONNAIS S.A., a corporation organized under French law; ARTÉMIS, S.A., a corporation organized under French law; ARTÉMIS FINANCE S.N.C., an entity doing business under French law; and FRANCOIS PINAULT, an individual, <br><br> Defendants, and <br><br> AURORA NATIONAL LIFE ASSURANCE COMPANY, a stock insurance company under California law; and NEW CALIFORNIA LIFE HOLDINGS, INC., a Delaware corporation, <br><br> Nominal Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> C.A. No. _____ |

## COMPLAINT FOR EQUITABLE RELIEF, DAMAGES AND OTHER RELIEF

Plaintiff AIG Retirement Services, Inc. (formerly known as SunAmerica Inc. and referred to herein as "SunAmerica") alleges:

### Introduction

1.       This lawsuit relates to a secret conspiracy by a group of French companies to acquire the junk bond securities and insurance assets of a failed California insurance company, Executive Life Insurance Company ("ELIC"), through unlawful means.  The co-conspirators, which are identified in paragraphs 12 to 24 herein, include defendants Crédit Lyonnais S.A. ("Crédit Lyonnais"), MAAF Assurances ("MAAF"), and Artémis, S.A. ("Artémis"). "Defendants" as used in this Complaint refers to the defendants named herein excluding nominal defendants New California Life Holdings, Inc. ("New California") and Aurora National Life Assurance Company ("Aurora").  The wrongful scheme, the facts and circumstances of which are alleged specifically below, has already led to investigations and criminal indictments by government authorities and guilty pleas by certain of the Defendants.  The cumulative total to date of the criminal fines and other payments made, or to be made, by Defendants to state and federal governments is nearly $800 million.  In a longstanding action by the Commissioner of the Department of Insurance of the State of California (the "Commissioner") that is now set for trial on February 15, 2005 (the "California Fraud Action"), the Commissioner is seeking damages of $3 billion from Defendants, and the Court has already ordered production of the co-conspirators' attorney-client communications based on a finding that the crime-fraud exception was met.

2.       The gravamen of the wrongful scheme was a secret fronting arrangement involving the ownership of stock in New California.  MAAF nominally acquired the majority of the stock of New California when, in fact, MAAF was really serving as a front to conceal Crédit

2

Lyonnais and its affiliates as the true owner of the New California stock. Aurora, as a wholly owned subsidiary of New California, assumed the assets and restructured liabilities of ELIC in a transaction with the Commissioner. Later, Artémis, through a wholly owned subsidiary of its own, acquired MAAF's stock in New California. Crédit Lyonnais, Artémis, MAAF and their co-conspirators concealed the fronting arrangements and unlawfully made a series of material and intentionally false statements to California insurance regulators and federal banking regulators, including the Commissioner, the court overseeing the rehabilitation of ELIC (the "Rehabilitation Court"), and the Federal Reserve about the actual ownership and control of New California.

### a. Defendants Conspire With Former Director of New California And Aurora In Breaches Of Fiduciary Duties To Those Companies

3.      Jean-Clause Seys was an officer of MAAF who helped to conceive the conspiratorial scheme and who was made a director of New California and Aurora to carry out the ends of the co-conspirators. He served as an initial member of the respective boards of New California and Aurora while knowing that the fronting arrangements were being concealed and that false statements were being made to the Commissioner, the Rehabilitation Court and the Federal Reserve regarding the actual ownership and control of New California. With the knowledge and assistance of Defendants, Seys misused his powers as a director of, and breached his fiduciary duties to, New California and Aurora to assist in the commission of the scheme.

4.      New California and Aurora have become embroiled as defendants in the California Fraud Action by the alleged imputation to those companies of the wrongdoing committed by Defendants. (Nothing alleged in this Complaint should be construed as an admission that New California and Aurora engaged in any unlawful conduct related to the subject matter of the California Fraud Action, and New California and Aurora have denied any liability). As a result of Defendants' conspiring with, and aiding and abetting, Seys in breaches

3

of his fiduciary duties to New California and Aurora, New California and Aurora have incurred millions of dollars in legal fees to defend themselves in the California Fraud Action and have suffered damages due to lost profits.

### b. Certain Defendants Breach Agreements With New California And Aurora

5.    New California and/or Aurora entered into separate, disclosed agreements with affiliates of MAAF and Crédit Lyonnais in connection with the acquisition of ELIC's assets. The MAAF affiliate agreed to restrictions on the transfer of stock in New California, and the Crédit Lyonnais affiliate agreed to take such actions as were necessary to bring about a lawful acquisition. Through their participation in the conspiracy, including acts of the co-conspirators to conceal the secret fronting arrangements and make false statements to state and federal regulators, both the MAAF affiliate and the Crédit Lyonnais affiliate breached their contractual obligations to New California and Aurora. These breaches have caused the companies to incur the expense of defending the California Fraud Action.

### c. Defendants Conspire With Certain Current Directors Of New California And Aurora To Interfere With Companies' Efforts To Defend The Commissioner's Claims

6.    Compounding their unlawful conduct, Defendants, operating through Artémis, have conspired with, and aided and abetted, certain current directors of New California and Aurora in order to prevent those companies from defending themselves in the California Fraud Action in a manner harmful to Defendants' interests. Artémis exercises sufficient control over New California and Aurora to cause them to act contrary to their best interests because Artémis appointed a majority of the current directors to the boards of the respective companies and the directors it appointed are beholden to Artémis based on extensive employment and financial ties and are willing to breach their fiduciary duties on its behalf. Abusing its control over New California and Aurora, Artémis in its self-interest has prevented the companies from

4

asserting claims against Artémis. In addition, Artémis has prevented New California and Aurora from asserting claims against co-conspirators Crédit Lyonnais and MAAF because, among other possible reasons, Crédit Lyonnais or its affiliates agreed to indemnify Artémis and MAAF against some or all of their loss resulting from claims arising from the ELIC transaction and Artémis does not wish to upset its indemnitor.

7.    Further abusing its control over New California and Aurora, Artémis, has prevented New California and Aurora from pursuing opportunities that were favorable to those companies to settle the Commissioner's claims, because Artémis wishes to have New California and Aurora available to contribute to a settlement or judgment in order to reduce the share ultimately paid by Artémis and spread the burden of defending the litigation. Given that Artémis has a partial, 67 percent ownership interest in New California, Artémis has an incentive to try to shift liability from itself to New California and Aurora. Plaintiff SunAmerica, which owns the other 33 percent of New California, would have to absorb its 33 percent share of any liability that Artémis avoids by preventing claims by New California and Aurora against Artémis and by shifting the cost of a settlement or judgment or the burden of defending the litigation from itself to New California and Aurora.

8.    SunAmerica brings this derivative suit on behalf of New California and Aurora for the damages those companies have suffered due to the wrongful acts of Defendants in (a) embroiling New California and Aurora in costly and protracted litigation and (b) preventing New California and Aurora from asserting claims against Defendants and pursuing advantageous opportunities to settle the Commissioner's claims.

5

## Parties

### a. Sun America, New California And Aurora

9.     SunAmerica is a corporation organized and existing under Delaware law, with its headquarters and principal place of business in California.

10.     New California is a corporation organized and existing under Delaware law with its headquarters and principal place of business in California. New California's board of directors is comprised of four members, three of whom are Artémis-affiliated directors. New California is joined as a nominal defendant in this action solely for the purpose of the derivative causes of action pleaded below.

11     Aurora, a stock insurance company organized and existing under California law, is wholly owned by New California. Aurora is authorized to do business in Delaware pursuant to 18 Del. C. § 505 *et seq.* Aurora's board of directors has seven members, four of whom are Artémis-affiliated directors. Aurora is joined as a nominal defendant in this action solely for the purpose of the derivative causes of action pleaded below.

### b. The Crédit Lyonnais Defendants

12.     Defendant Altus Finance S.A. ("Altus") is a corporation organized under French law. Altus changed its name to CDR Enterprises in or about January 1996 and is therefore the predecessor, predecessor in interest, and alter ego of Defendant CDR Enterprises. At all times material hereto, Altus was owned and controlled by Defendant Crédit Lyonnais.

13.     Defendant CDR Enterprises is a corporation organized under French law. CDR Enterprises is a successor, successor in interest, and alter ego of Altus.

14.     CDR Enterprises is wholly owned by Defendant Consortium de Realisation S.A., a corporation organized under French law, and is the successor in interest to Crédit Lyonnais. Defendants CDR Enterprises and Consortium de Realisation S.A. (collectively

6

referred to as "CDR") are responsible as successors in interest for all debts and liabilities of Altus and Crédit Lyonnais arising in connection with the acts complained of herein.

15.    Defendant Crédit Lyonnais S.A. ("Crédit Lyonnais") is a corporation organized under French law. Crédit Lyonnais is and was an alter ego of Altus and CDR.

16.    Defendants CDR, Altus and Crédit Lyonnais are referred to herein as the "Crédit Lyonnais Defendants."

### c. The MAAF Defendants

17.    Defendant MAAF Assurances is a mutual insurance company organized under French law, sometimes known as La Société Mutuelle Assurance Artisalane De France (collectively, "MAAF"). MAAF is a participant in the MAAF Syndicate.

18.    Defendant MAAF Vie S.A. is a stock life insurance company organized under French law, sometimes known as La Société Mutuelle Assurance Artisalane de France Vie S.A. (collectively, "MAAF Vie"). It is wholly owned by Defendant MAAF and a participant in the MAAF Syndicate.

19.    Defendants MAAF and MAAF Vie are referred to herein as the "MAAF Syndicate" or "MAAF Defendants."

### d. The Artémis Defendants

20.    Defendant Artémis S.A. ("Artémis") is a corporation organized under French law. At all times material hereto, Artémis was owned, in part, by Defendant Altus.

21.    Defendant Artémis Finance S.N.C. ("Artémis Finance") is an entity organized and doing business under French law. At all times material hereto, Artémis was the majority owner of Artémis Finance.

22.    Defendant Aurora, S.A. ("Aurora, S.A.") is a corporation organized under French law that is owned by Artémis. In 1993, Aurora, S.A. became (and still is) the record

7

owner of a majority of the stock of New California and, through New California, the new insurance business conducted by Aurora.

23.    At all times relevant hereto, Defendant Francois Pinault ("Pinault") was an officer, director and ultimate majority owner of Artémis, Artémis Finance and Aurora, S.A.

24.    Artémis, Artémis Finance, Aurora, S.A., and Francois Pinault are referred to herein as the "Artémis Defendants."

## Jurisdiction

25.    This Court has jurisdiction over all Defendants pursuant to 10 Del. C. § 3104. New California was formed in Delaware and acquired 100 percent of the stock of, and a controlling interest in, a company that assumed the rehabilitated insurance business of ELIC. The formation of New California was caused by the filing of a certificate of incorporation for the company with the Delaware Secretary of State, and the existence of New California was maintained by the filing of annual reports with the Delaware Secretary of State. The filing of these documents was a direct and foreseeable result of the conspiracy. In misusing the formation of New California, Defendants acted with the intent to benefit themselves.

## Defendants' Wrongful Scheme

26.    In 1990 and the early part of 1991, ELIC was experiencing severe financial problems, in large part because the value of its large portfolio of high-yield, or junk, bonds, acquired in the late 1980s, had declined precipitously.

27.    On April 11, 1991, the Rehabilitation Court appointed the Commissioner as the conservator of the ELIC estate. Commissioner Garamendi established a competitive bidding process for the right to rehabilitate ELIC. The Commissioner stated his desire that any proposal include a bid on both the ELIC high yield bond portfolio and the restructuring of the insurance business.

8

28.    Shortly thereafter, the Commissioner announced a proposed plan under which Altus, a corporation organized under French law and controlled by the French bank Crédit Lyonnais, would acquire the high yield bond portfolio, and a buyer or buyers located by Altus, to be identified later, would acquire and rehabilitate the insurance business of ELIC itself.

29.    At all relevant times, both federal and state law prohibited Altus and Crédit Lyonnais from owning or controlling, directly or indirectly, the insurance business of ELIC, without regulatory permission. The Bank Holding Company Act, former 12 U.S.C. § 1841 *et seq.*, prohibited a bank holding company from directly or indirectly owning an interest greater than 25 percent in any company that was not a bank or other authorized business, absent permission from the United States Federal Reserve. California Insurance Code § 699.5, which sets limits on ownership and control of California insurance companies by foreign governments, prohibited Crédit Lyonnais or Altus from owning or controlling a California insurance company, absent permission from the Commissioner.

30.    To overcome this deficiency and to permit it to bid for ELIC's securities portfolio, Crédit Lyonnais, a bank then controlled by the French government, entered into a secret agreement with MAAF and other parties belonging to the MAAF Syndicate, by which it would appear that MAAF was purchasing the ELIC insurance business when in fact, through a series of secret contracts (the *"contrats de portage,"* described at paragraphs 35 to 41 herein), Crédit Lyonnais and its affiliates would be the true owners of the shares in what became New California.

31.    In the first half of July 1991, Jean-Francois Henin, the Chief Executive Officer of Altus, approached François Marland, a director of MAAF and a customer of Altus, to suggest that MAAF take over some of ELIC's insurance assets. That request led to a meeting

9

ᘓ013                    CDR                    3623    052531352627 XVA EE:8T NΩΓ 50, ⅞0/5Z

between Henin and Jean-Claude Seys, who was responsible for the general management of MAAF and MAAF Vie.

32.    Seys informed Henin that MAAF could not join an investor group to acquire ELIC's insurance business, because MAAF did not have the expertise or the time to evaluate such an investment.    As the discussion progressed, Seys and Henin discussed arrangements, such as a put or similar contractual arrangement, that would allow MAAF to participate in the acquisition of ELIC's insurance business without assuming any risk of loss.  As a result of further discussions, MAAF and Altus agreed to arrangements pursuant to which the parties would form a new Delaware corporation (which became New California) whose shares would be acquired initially by the MAAF Syndicate.  The parties secretly agreed that the Crédit Lyonnais Defendants would control MAAF's shares, and that, at a date in the future, MAAF would sell its New California shares to Altus or Altus' designee at a fixed price, thereby eliminating any risk to MAAF.

33.    The parties also agreed that MAAF and MAAF Vie would vote shares of New California and otherwise act concerning New California only at the direction of Altus.  Further to this secret arrangement, Altus agreed that it would indemnify MAAF and MAAF Vie against any loss resulting from the New California arrangements.

## The Formation Of New California

34.    On July 30, 1991, New California was incorporated in Delaware.  To effect this step, a Certificate of Incorporation was filed with the Secretary of Delaware in Dover, Delaware.

10

## The *Contrats De Portage*

35.   The arrangements among the Crédit Lyonnais Parties and the MAAF Syndicate members were formalized on August 6, 1991, when MAAF, on behalf of itself and MAAF Vie, and Altus entered into a "Promise to Purchase Stock" concerning New California.

36.   Pursuant to the Promise to Purchase Stock, Altus "irrevocably and unconditionally [undertook] to purchase or cause to have purchased by any natural person or legal entity it may designate to replace it, all of the Shares the Promissee [MAAF] holds in Executive Life. . . ."

37.   The Promise to Purchase Stock contains an explicit secrecy provision by which each of the parties to the agreement covenants that it will not disclose the existence of the agreement or its terms to any third party.

38.   On November 15, 1991, Altus, MAAF, and MAAF Vie signed a Management Agreement that provided that "while MAAF and MAAF Vie will nominally own the New California shares, MAAF and MAAF Vie will exercise any rights they may have as shareholders of NEW CALIFORNIA only at the direction of Altus in order to implement Altus' strategy with respect to such holdings." The Management Agreement further referred to MAAF and MAAF Vie as "temporary managers" of New California, and recited that the Management Agreement was intended to relieve MAAF and MAAF Vie of all responsibility or liability in connection with the management of New California and Aurora. To that end, the Management Agreement provided that Altus would hold MAAF and MAAF Vie harmless against loss in connection with their fronting role.

39.   Like the Promise to Purchase Stock, the Management Agreement provided that it was to be kept secret from third parties.

11

40. The Promise to Purchase Stock and Management Agreement relating to New California were intended to be, and in fact were, *contrats de portage*, a French term referring to contracts used to establish secret fronting relationships such as those reflected in the agreements.

41. The *contrats de portage* were intended to and did make it appear as if MAAF was a legitimate, independent investor that was acquiring shares in New California, while secretly giving Altus and Crédit Lyonnais total ownership and control over MAAF's shares. The Crédit Lyonnais Parties and the MAAF Defendants were each aware of the secret agreements and of the manner in which they were to be used to conceal the true owner of MAAF's shares.

### Defendants' False Statements To The Commissioner, The Rehabilitation Court and Federal Banking Regulators

42. Further to the conspiracy alleged herein, commencing in July or August 1991, and continuing for at least four years thereafter, MAAF Vie and MAAF intentionally made misstatements to the Commissioner, the Rehabilitation Court and federal banking regulators that MAAF Vie was to be the true owner of the shares of New California. Defendants deliberately failed to disclose that Altus and Crédit Lyonnais would in fact control MAAF's shares.

43. On or about March 3, 1992, with the approval of the Rehabilitation Court, the Commissioner transferred ownership of the majority of ELIC's junk bond portfolio to Altus.

44. On July 31, 1992, the Rehabilitation Court approved the rehabilitation plan and the transfer of ELIC's insurance business to New California, then fully owned by the MAAF Syndicate. The decision of the Rehabilitation Court was appealed, and the sale of the insurance business was stayed pending resolution of the appeal.

12

## The Artémis Defendants' Participation In The Conspiracy

45.    Artémis came into being in approximately November 1992, when Financière Pinault, a corporation organized under French law that is substantially owned and controlled by Defendant Francois Pinault, acquired a shell company from Crédit Lyonnais and renamed it Artémis. Crédit Lyonnais, various Crédit Lyonnais affiliates, and Financière Pinault recapitalized Artémis, and, as of January 1993, Altus owned approximately 24.5 percent of Artémis (in part through a secret agreement with another company) and Financière Pinault owned the rest. At the same time, Crédit Lyonnais effectively owned and controlled at least 44 percent of Financière Pinault, in part through one of its subsidiaries and in part through secret agreements with other companies. Artémis became, as later described in a confidential Crédit Lyonnais internal memorandum, a "de facto partnership" between Crédit Lyonnais and the Pinault Group.

46.    For several years thereafter, Pinault sat on the Crédit Lyonnais board of directors. Pinault also became chairman of Artémis.

47.    In late 1992, Artémis became a participant in the conspiracy described above through the knowing involvement of its officers, directors, employees, and agents. Artémis did so with the intent to conceal the true majority ownership of the new insurance business that became New California from the Commissioner, the Rehabilitation Court and the Federal Reserve.

48.    In December 1992, after the sale of ELIC's securities portfolio to Altus was completed, Crédit Lyonnais, Altus, and Financière Pinault entered into a memorandum of understanding whereby Altus was to sell, and Artémis was to buy, $2 billion of the securities formerly held by ELIC. In or about December 1992 and May 1993, Altus transferred a portion of the ELIC junk bond portfolio to Artémis and Artémis Finance. At the time of these transfers,

13

the Artémis Defendants knew of the existence of the secret *portage* agreements and the misrepresentations to government regulators and intended to conceal the scheme. The entire funds for the purchase were loaned to Artémis by Crédit Lyonnais and Altus or their affiliates. Artémis was required to pay approximately $105 million in future commissions to the investment advisor that had assisted Altus in the purchase of the ELIC bond portfolio. In exchange, Altus granted Financière Pinault an option to purchase, at Altus' cost, one of four specified assets, one of which was shareholder rights in Aurora. In May 1993, Altus and Artémis entered into an agreement under which Altus agreed to indemnify Artémis against any loss arising from disputes relating to the transaction with the California Insurance Commissioner, and Artémis agreed that Altus would have control over decisions made by Artémis relating to the handling of such disputes. In furtherance of the conspiracy, Artémis knowingly allowed the concealment of the December 1992 memorandum of understanding and the May 1993 agreement from the California Department of Insurance, the Rehabilitation Court and the Federal Reserve. Artémis knew that false representations had been made to those agencies and the Rehabilitation Court, and would be made in the future, that MAAF was the owner of shares in New California, and that Altus had no ownership interest in New California and Aurora.

49.    In March 1993, the California Court of Appeal issued a decision requiring the Rehabilitation Court to make certain changes in the plan of rehabilitation. Thereafter, proponents of the rehabilitation plan, including the Commissioner, requested that the Rehabilitation Court approve modifications designed to cure the deficiencies identified in the appellate decision and allow the sale of the insurance business to New California to go forward in accordance with the now modified plan of rehabilitation. On or about August 13, 1993, the

Rehabilitation Court approved the modified rehabilitation plan under which the insurance business was sold to New California.

50.    In 1994 and 1995, Artémis, through Aurora, S.A., acquired the shares in New California held by the MAAF Syndicate. Artémis' wrongful conduct in support of the unlawful conspiracy includes making numerous deliberately false filings with the Commissioner during that period, including misrepresentations regarding (a) the true ownership and control of the shares of New California held by Artémis through Aurora, S.A., (b) the ownership of Artémis itself, and (c) the source of the funds used by Artémis to acquire shares in New California through Aurora, S.A.

## SunAmerica Purchases Shares In New California Without Knowledge Of The Unlawful Scheme

51.    In 1993, after the appellate decision was issued, SunAmerica purchased 33 percent of the stock of New California.

52.    SunAmerica made this purchase with no knowledge of the *contrats de portage*, with no knowledge that the other shareholders in New California were any entities other than the publicly-identified members of the MAAF Syndicate, and with no knowledge that Defendants had made repeated statements to the Commissioner, the Rehabilitation Court and the Federal Reserve that would lead to criminal charges against many of the Defendants and would embroil New California in years of litigation. To the contrary, Defendants, directly or indirectly, made statements to SunAmerica that failed to disclose these facts and that misled SunAmerica about the true ownership and control of New California.

## The California Fraud Action

53.    In March 1999, the Commissioner filed *Garamendi v. Altus Finance, S.A., et al.* (U.S. Dist. Court, Central District of California, Case No. 99-02829 AHM (CWx) (the

15

"California Fraud Action")) against many of the French entities and associated named as Defendants in this action, including the Crédit Lyonnais Defendants and the MAAF Defendants. New California, Aurora, and Artémis were first named as defendants in the California Fraud Action on or about February 16, 2000, when the Commissioner filed a Third Amended Complaint for Fraud, Misrepresentation, Deceit, Conspiracy, Unjust Enrichment, Involuntary Trust, Money Had and Received, Conversion, Unfair Competition, and an Accounting.

54.    In the California Fraud Action, the Commissioner claims, *inter alia*, that he was fraudulently induced to transfer both the bond portfolio and the insurance business of ELIC by operation of the conspiracy described above. He alleges that he would not have transferred either the bond portfolio or the insurance business had he known the true identity of the parties that would actually exercise control over shares in New California.

55.    The plaintiff in the California Fraud Action seeks approximately $3 billion in damages and $2 billion in restitution against all defendants, including approximately $3 billion in damages and $500 million in restitution against New California and Aurora.

56.    New California and Aurora moved to dismiss the claims asserted against them in the California Fraud Action, and later moved for summary judgment. Both motions have been denied. In denying summary judgment, the court held that there is sufficient evidence to raise a triable issue whether (a) the other defendants engaged in a fraudulent conspiracy to acquire the ELIC assets, and (b) their unlawful conduct ultimately may be attributed to New California and Aurora. As a result of the California Fraud Action, New California and Aurora have been burdened by the cost of their defense.

57.    New California and Aurora also became embroiled in other proceedings relating to the same subject matter of the California Fraud Action. New California and Aurora

16

were named as defendants in a lawsuit brought by Sierra National Insurance Holdings ("Sierra"), which was a disappointed bidder for ELIC's assets in 1991. New California and Aurora incurred expense defending that litigation and, to avoid further such expense and the risks and uncertainties of the litigation, paid $11,950,000 to settle Sierra's claims. In addition, New California and Aurora have incurred expense responding to government investigations (described below) relating to the ELIC transaction. All of these costs of defense and settlement have been attributable to Defendants' breaches of contract with New California and Aurora or conspiring in, and aiding and abetting, breaches of fiduciary duties owed to New California and Aurora by certain of their directors.

## Certain Defendants Plead Guilty To Criminal Charges And Agree To Pay $770,000,000 To Settle Claims Brought By The United States Department of Justice

58.    The United States Department of Justice, through the United States Attorney's Office for the Central District of California, investigated Defendants' activities, and according to public reports at the time, prepared indictments charging several of Defendants with control of the ELIC insurance business described above. Although the Department of Justice was precluded (subject to an appeal pending in the Ninth Circuit) by a cooperation agreement from indicting Artémis and related persons and entities, the Department of Justice was reportedly prepared to institute a civil forfeiture action to obtain Artémis' interest in New California on the grounds that Artémis had participated in a conspiracy to commit wire and mail fraud, commission of mail and wire fraud, and money laundering. Absent the cooperation agreement, the Department of Justice was also prepared to indict a director general of Artémis, Patricia Barbizet, who is also currently an Artémis-appointed member of the boards of directors of New California and Aurora.

17

59.    In December 2003, certain parties announced a settlement of approximately $770,000,000 to settle certain of the criminal claims asserted against Crédit Lyonnais and its co-conspirators, including Artémis, arising from the transfer of the bond portfolio and insurance business formerly owned by ELIC. Pursuant to the agreement, Crédit Lyonnais and Defendant CDR Enterprises each pleaded guilty to three felony counts of making false statements to the Federal Reserve. Crédit Lyonnais agreed to pay a $100,000,000 criminal fine and to pay an additional $100,000,000 civil penalty to the United States Treasury, and to be on probation for three years. CDR Enterprises agreed to pay $375,000,000 into a settlement fund to be held in reserve pending the outcome of the California Fraud Action. MAAF and its chairman, Jean-Claude Seys, each pleaded guilty to two felony charges of causing false statements to be made to the Federal Reserve and agreed to pay a $10,000,000 criminal fine. Artémis agreed to pay $185,000,000, of which $110,000,000 was to be paid to the California Insurance Commissioner, with the remaining $75,000,000 held in reserve pending the outcome of the California Fraud Action. Barbizet paid $1 million and entered into an agreement prohibiting her from entering the United States during a three-year period.

### A Court Finds A Prima Facie Case That
### Artémis Has Engaged In Criminal Or Fraudulent Conduct

60.    The Court hearing the California Fraud Action issued an order on July 30, 2004 finding that a prima facie showing had been made that the Artémis Defendants (including Artémis, Artémis Finance and Francois Pinault) have made knowing and deliberate misrepresentations to the California Department of Insurance concerning (i) the ownership of Artémis, (ii) certain agreements concerning the acquisition of and economic interests in the insurance business acquired by New California, including agreements among Crédit Lyonnais, Altus and Pinault, and certain other agreements between Artémis, MAAF and another entity, and

18

(iii) the source of the funds to be used for the Artémis Defendants' acquisition of New California.

61.    Based upon its findings, the court in the California Fraud Action held that the crime-fraud exception applied under relevant principles of California and federal law, and that the Artémis Defendants therefore could not assert claims of attorney-client privilege or qualified work product privilege with respect to communications made in furtherance of a crime or fraud.  The court therefore ordered that certain communications between the Artémis Defendants and their attorneys be produced and subject to discovery.

**The Artémis-Affiliated Directors Wrongfully Refuse To Recuse Themselves From Decisions Relating To New California And Aurora's Defense Of California Fraud Action**

62.    The Artémis-affiliated directors, or certain of them, suffer serious and disabling conflicts of interest in participating in decision of the New California and Aurora boards relating to the defense of the California Fraud Action.  Pinault owns and controls, directly or indirectly, a large collection of businesses in France and around the world, including such well known luxury companies as Gucci, Yves Saint Laurent and Chateau Latour.  Pinault has employed the Artémis-affiliated directors in his business empire in various capacities for more than a decade, frequently as directors of his various businesses or their holding companies, including Artémis and Artémis Finance.  In exchange for carrying out the wishes of Pinault and following his directions in their capacities as directors of his companies, each of the Artémis-affiliated directors has been rewarded with significant compensation, power and prestige.  Each such director depends on the continued favor of Pinault in order to maintain their compensation, power and prestige in the future, and Pinault's favor depends on each such director's continuing to carry out his wishes and following his directions in their capacities as directors of his companies. Each Artémis-affiliated director makes decisions as a director of New California and

19

Aurora based on what is in the best interests of Artémis and therefore Pinault, without regard to New California and Aurora to the extent the interests of the latter companies conflict with the interests of Artémis and therefore Pinault.

63.    Artémis-affiliated director Patricia Barbizet was hired by Pinault in late 1988 or early 1989 to assist him with the financial affairs of his various businesses. From the very beginning of her involvement with Pinault, she had frequent contacts with Pinault himself and answered to him. Pinault made Barbizet a director general of Artémis on or about the time that it was created in 1992. Pinault has rewarded her generously for her loyal service. He made her a director general of Financiere Pinault, a holding company for Pinault, and further made her a board member of many of the companies in Financiere Pinault, including Gucci, Yves Saint Laurent and Chateau Latour. Barbizet was also a board member of Crédit Lyonnais along with Pinault. Barbizet is part of Pinault's inner business circle and is beholden to him for the financial benefits, director positions and corporate perquisites he has bestowed on her. Barbizet has been a director of New California since 1995 and a director of Aurora since 1996. She was appointed to each such board by Artémis. She became aware of the *portage* agreements prior to becoming a director of either company, and concealed those agreements from the boards of both companies and from SunAmerica until the conspiracy unraveled in late 1998 and early 1999.

64.    Artémis-affiliated director Erulin was hired by Pinault and Barbizet in 1993 to work for Artémis. One of his initial responsibilities was the business conducted by Artémis in the U.S., including its acquisition of stock in New California. In his capacity as the person responsible for development at Artémis, Erulin is currently the representative of Artémis principally responsible for its interests in New California and Aurora. He reports to Pinault and Barbizet. Erulin continues to be employed at Artémis and receives substantial compensation for

20

his work for the Pinault group of companies. Erulin has been a director of Aurora since 1996 and a director of New California since 2002. He was appointed to each board by Artémis. He became aware of the *portage* agreements prior to becoming a director of Aurora, and concealed the agreements from the Aurora board and SunAmerica until the conspiracy unraveled.

65.    Artémis-affiliated director Ryan has been doing business with Pinault from 1975 or 1976 through the present. During that period, Ryan, either personally or through his company, J J Ryan & Sons, has provided various personal services to Pinault, including tax planning advice and advice relating to Pinault's apartment in New York. Pinault paid Ryan handsomely for these services, including an annual fee of approximately $480,000 during the period from around 1998 to 2002. At Pinault's request, Ryan has served as a director of many Pinault companies, particularly companies operating in the U.S., and has received board fees from these companies on top of his compensation from Pinault for other services. Pinault made Ryan a director of Artémis on or around the time of the acquisition of the junk bonds and insurance business of ELIC. Ryan became a director of New California in 1995 and a director of Aurora in 1996. He was appointed to both boards by Artémis.

66.    Artémis-affiliated director Etienne Rosenstiehl was appointed to the Aurora board by Artémis and has been a director of Aurora since sometime in 1992.

67.    As directors of New California and Aurora, each of Barbizet, Erulin and Ryan, and, upon information and belief Rosenstiehl, has serious and disabling conflicts of interests that prevents them from exercising business judgment on behalf of New California and Aurora in making decisions regarding the handling of the California Fraud Action. In response to requests by the independent directors, the Artémis-affiliated directors have wrongfully refused to recuse themselves from decisions relating to the litigation.

21

68.     Barbizet, Erulin, and Ryan make up three of the four members of New California's board, and Barbizet, Erulin, Ryan and Rosenstiehl make up four of the seven members of Aurora's board of directors. The Artémis-affiliated directors have voted as a block on decisions relating to the California Fraud Action. Defendants, acting through the Artémis-affiliated directors, have made litigation and settlement decisions as directors of New California and Aurora that are calculated to advance the interests of Artémis at the expense of New California and Aurora and that have impaired the interests of New California and Aurora by preventing the companies from pursuing claims against Defendants and obstructing opportunities to settle the Commissioner's claims on terms advantageous to New California and Aurora.

### Defendants Interfere With Litigation Decisions To Further Their Interests

69.     Defendants, acting through the Artémis-affiliated directors, have made litigation and settlement decisions as directors of New California and Aurora that have impaired the interests of New California and Aurora in favor of Defendants' interests. First, the Artémis-affiliated directors have refused to recuse themselves from such decisions despite the aforementioned conflicts of interest. Second, the Artémis-affiliated directors have prevented New California and Aurora from initiating claims against Defendants, either in the California Fraud Action or by the commencement of a separate suit. Third, the Artémis-affiliated directors have prevented New California and Aurora from pursuing opportunities to settle the Commissioner's claims on terms advantageous to New California and Aurora.

70.     At a December 7, 2004 joint meeting of the boards of directors of New California and Aurora, the independent directors requested that the Artémis-affiliated directors, in their capacities as directors of New California and Aurora, recuse themselves from participating in future decisions regarding the initiation of claims against the Defendants or the defense or settlement of the Commissioner's claims against New California and Aurora, because

22

conflicts of interests, described above, prevent these directors from acting in the best interests of New California and Aurora with respect to such matters. The Artémis-affiliated directors rejected that request and thereby blocked board approval. The independent directors had on several occasions prior to that meeting made the same request, and in each instance, the Artémis-affiliated directors had rejected the request and thereby blocked board approval. At the same joint meeting of the boards mentioned above, the independent directors proposed the establishment of a special litigation committee of independent directors to manage the defense and settlement of the claims against New California and Aurora in the California Fraud Action. The Artémis-affiliated directors opposed that request as well and thereby blocked board approval.

71.    On or around late 2003, Artémis discussed with the United States Department of Justice and the Commissioner, without authorization from the boards of directors of New California and Aurora and without informing the independent directors, the companies' independent litigation counsel and SunAmerica, potential terms upon which the criminal proceedings and the California Fraud Action might be settled, by payments not only from Artémis but also from New California and Aurora. Upon learning of the existence of these unauthorized settlement discussions, SunAmerica made a written request to Artémis for copies of all written settlement proposals resulting from these unauthorized negotiations involving New California and Aurora, but Artémis refused to turn over these documents.

72.    The Artémis-affiliated directors have shown a blatant disregard for the severe conflicts of interest to which they are subject, and have clearly signaled that they are not willing to take the necessary steps to ensure that litigation and settlement decisions are made in a way that serves the best interests of New California and Aurora. This stance by the Artémis-

23

affiliated directors is consistent with an extended history on the part of these directors of violating their duties of loyalty and care to New California and Aurora.

      73.    After the filing of the California Fraud Action, the Artémis-affiliated directors failed to give good faith consideration to settlement proposals from the Commissioner. One such settlement overture would have dismissed New California and Aurora from the litigation, thus allowing New California and Aurora to avoid any possible liability from the California Fraud Action and the cost of having to defend against the Commissioner's claims, as long as the funds from a proposed sale of the companies were placed in an escrow fund pending resolution of the Commissioner's claims against Artémis. The Artémis-affiliated directors refused to authorize New California and Aurora to pursue this proposal, even though it would have involved no cost to the companies. A second overture from the Commissioner that the Artémis-affiliated directors refused to authorize the companies to pursue would have required New California and Aurora to pay $10 million, which is a small fraction of the amount that Artémis later sought from the companies as payment to settle the claims against New California and Aurora. In both instances in which the Commission made proposals to settle with New California and Aurora, the independent directors, based on the conclusion that the proposed settlements were in the best interests of New California and Aurora, urged that the respective boards pursue settlement on the terms proposed, but the Artémis-affiliated directors prevented pursuit of such settlement proposals. The Artémis-affiliated directors did not reject the earlier and more favorable settlement opportunities because of a good faith belief or a reasoned judgment that the proposals were not in the best interest of either New California or Aurora. Instead, the Artémis-affiliated directors' motive was to preserve the advantage to Artémis and the other Defendants of having New California and Aurora as co-defendants in the California

24

Fraud Action, and thus as potential contributors to any judgment that might be obtained or to any settlement.

74.    The earlier settlement proposals by the Commissioner that were blocked by the Artémis-affiliated directors as alleged above were much more favorable to New California and Aurora than the settlement amounts that Artémis later sought from New California and Aurora, and the consummation of the earlier proposals would have allowed New California and Aurora to avoid having to pay the millions of dollars in attorneys' fees and expense costs they have incurred since that time in connection with the California Fraud Action. The Artémis-affiliated directors have interfered with the ability of New California and Aurora to have settlement discussions with the Commissioner independent of Artémis, and instead have been complicit with Artémis and the other Defendants in their plan to cause New California and Aurora to pay a disproportionate share relative to Artémis and the other Defendants in any settlement with the Commissioner.

75.    The boards of New California and Aurora have been presented with proposals to pursue legal claims against Defendants or certain of them. The independent directors, based on their conclusion that the bringing at that time of legal claims against Defendants was in the best interests of New California and Aurora, sought board approval for those actions. The assertion of the proposed claims presented important strategic advantages to New California and Aurora in seeking to minimize the potential harm to them as a result of the claims against them in the California Fraud Action; and, if successful, the proposed claims could result in considerable relief to New California and Aurora for the wrongful scheme perpetrated by Defendants.

25

76.    However, beginning in April 2001, the Artémis-affiliated directors, despite the urging of the independent directors and contrary to the best interests of New California and Aurora, have refused to authorize pursuit of the proposed legal claims. The Artémis-affiliated directors did not decline to allow New California and Aurora to bring the proposed legal claims out of a good faith belief or a reasoned judgment that refraining from making such claims was in the companies' best interests. Given the substantial financial and legal ties among Defendants, as described above, such directors were influenced by this conflict of interest when asked to decide whether New California and Aurora should assert claims against Defendants. The Artémis-affiliated directors did not fully disclose all such relationships to the independent directors and did not disclose that, in light of such ties, they had a direct conflict of interest in any decision about whether New California and Aurora should bring those claims.

77.    In May 2001, SunAmerica, derivatively on behalf of New California and Aurora, sought to intervene in the California Action in order to assert claims along the lines that the Director Defendants had refused to permit the companies to bring against certain of the co-conspirators. The court denied the motion to intervene, however, on the grounds that SunAmerica was unable to show that its interests were not sufficiently represented by all the defendants in the California Fraud Action in their desire to defeat the Commissioner's claims. At that time, however, the criminal pleas by Crédit Lyonnais and MAAF had not occurred, and the co-conspirators had not agreed to $770 million in criminal fines and other payments. Those developments underscore the serious conflicts of interest that now exist between New California and Aurora and the other defendants in the California Fraud Action.

78.    Recently, after the court in the California Fraud Action denied summary judgment to New California and Aurora, the independent directors of the companies again urged,

26

and again to no avail, that New California and Aurora file an independent action in Delaware against Defendants or certain of them. At the December 7, 2004 joint meeting of the New California and Aurora boards, the Artémis-affiliated directors rejected the proposal that such a lawsuit be filed. The Artémis-affiliated directors did not reject the proposal based on a good faith belief or reasoned judgment that it was not in the best interests of New California and Aurora. Instead, they recognized that assertion of claims against Defendants would be detrimental to Artémis and the other Defendants, and they therefore rejected the proposal to protect the interests of Artémis and the other Defendants.

79. By failing to recuse themselves from litigation and settlement decisions, preventing the filing of claims against Defendants, and interfering with the pursuit of a settlement of the Commissioner's claims, the Artémis-affiliated directors have breached their fiduciary duties to New California and Aurora. Defendants have conspired with, and aided and abetted, these breaches of fiduciary duties based on the facts alleged above, including, but not limited to, (a) the extensive coordination of Defendants from 1992 to 1998 in entering and concealing the *portage* agreements and making numerous false statements to the Commissioner, the Rehabilitation Court and the Federal Reserve; (b) substantial claims for joint and several damages that the Commissioner is bringing against Defendants, New California and Aurora; (c) the shared interests of Defendants in avoiding claims by New California and Aurora and in keeping them in the California Fraud Action as potential contributors to a joint settlement or judgment; (d) the overlapping ownership interests and interlocking board memberships between Crédit Lyonnais and Artémis; (e) Altus' agreements to indemnify Artémis and MAAF from loss arising from the California Fraud Action; and (f) the extensive employment and financial ties between Artémis and the Artémis-affiliated directors. As a result of such breaches of fiduciary

27

duties, New California and Aurora have been forced to incur expense defending themselves in the California Fraud Action, the Sierra lawsuit and government proceedings and to go to trial in the California Fraud Action to avoid an adverse judgment.

### The Tolling Agreements

80.   SunAmerica did not learn, nor, in the exercise of reasonable diligence, could have learned, of the existence of the claims asserted herein before the period on or around late 1998 or early 1999, shortly before the California Fraud Action was filed.

81.   In 2001 and 2002, New California and Aurora entered into tolling agreements with the corporate Defendants. Each tolling agreement provides that, if any party subsequently sought to assert claims related to the subject matter of the California Fraud Action, no party to the agreement would oppose the claim or assert a defense based upon a statute of limitations, the doctrine of laches, or any other defense based on the passage of time from the agreement's effective date to the date any such claim was filed.

82.   As to any Defendants not subject to a tolling agreement, the causes of action asserted herein against those Defendants include claims that accrued within the limitations period.

### DERIVATIVE CAUSES OF ACTION BY SUNAMERICA ON BEHALF OF NEW CALIFORNIA AND AURORA

83.   New California and Aurora have been injured and possess claims for relief against Defendants identified in the causes of action set forth below. SunAmerica states the following causes of action derivatively on behalf of New California and Aurora.

84.   There are only two shareholders of New California, which is the holding company of Aurora: (a) Aurora, S.A., which owns 67 percent of the outstanding shares of stock in New California and thus holds the controlling interest in that company and, by extension, a

28

controlling interest in Aurora; and (b) SunAmerica, which owns 33 percent of the outstanding shares and thus a minority interest in New California and, by extension, Aurora.

85.    Any demand that the directors authorize the companies to bring these derivative causes of action would be futile because it is the majority directors themselves, and their controlling entity, that have committed these wrongs.

86.    For the reasons alleged above, the boards of directors of New California and Aurora are not in a position to exercise business judgment with respect to whether the derivative claims here should be brought. Artémis, acting through Aurora, S.A., the controlling stockholder of New California, which itself is the sole stockholder of Aurora, is a principal defendant in the California Fraud Action, and has an economic interest in connection with that action that is contrary to the interests of New California and Aurora. The Artémis-affiliated directors, as directors of New California and Aurora, similarly have conflicting duties of loyalty, and are not in a position to exercise business judgment on behalf of those companies with respect to defense, settlement or assertion of claims related to the California Fraud Action.

87.    The futility of any demand pursuant to Chancery Court Rule 23.1 is graphically illustrated by the history of this case, including the refusal of the Artémis-affiliated directors to establish a special committee to oversee litigation decisions for New California and Aurora and the acts of those directors to block the companies from bringing claims against any of the Defendants and to shift the cost of any settlement or judgment in the California Fraud Action from Defendants to New California and Aurora. In these circumstances, it is plain that a further demand on the boards of directors of New California and Aurora to recuse themselves from further litigation decisions and to assert the already rejected claims would be futile.

29

### FIRST DERIVATIVE CAUSE OF ACTION – BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

#### (Against MAAF Vie)

88.     SunAmerica incorporates by reference each of the allegations contained in paragraphs 1 through 87 above as though fully set forth herein.

89.     MAAF Vie and New California are signatories to a written July 16, 1993 Agreement Restricting Transfer of Shares (the "MAAF Agreement Re Share Transfer"), which is a valid, binding and enforceable contract by, against, and among the signatories thereto. Implied in the MAAF Agreement Re Share Transfer is a covenant of good faith and fair dealing, enforceable by, against, and among each of the signatories to that agreement.

90.     Aurora is a third-party beneficiary of the MAAF Agreement Re Share Transfer.

91.     MAAF Vie has violated the express terms of the MAAF Agreement Re Share Transfer by the wrongful conduct alleged herein. The Agreement re Share Transfer recited that the Commissioner had issued a permit to Aurora that imposed restrictions on the transfer of shares in New California. In the Agreement re Share Transfer, MAAF Vie agreed not to sell, transfer or encumber certain of its shares in New California unless certain conditions were satisfied. The restrictions on transfer and the exceptions thereto are stated in paragraphs 1 and 2 of the Agreement re Share Transfer. The secret portage agreements between MAAF Vie, MAAF and Altus operated as a sale, transfer or encumbrance of MAAF Vie's interest in New California to Altus. Such sale, transfer or encumbrance did not meet any of the conditions of the Agreement re Share Transfer.

92.     Alternatively, by the wrongful conduct alleged herein, MAAF Vie has violated the covenant of good faith and fair dealing implied by the terms of the MAAF

30

Agreement Re Share Transfer. Under said covenant, MAAF Vie agreed not to enter into arrangements that in substance constituted a sale, transfer or encumbrance of its shares in New California, even if MAAF Vie remained the nominal owner. The secret portage agreements constituted such arrangements and thereby violated the covenant.

93.    Such breaches by MAAF Vie have proximately caused economic harm to New California and Aurora.

## SECOND DERIVATIVE CAUSE OF ACTION – BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against Altus)

94.    SunAmerica incorporates by reference each of the allegations contained in paragraphs 1 through 93 above as though more fully set forth herein.

95.    Altus and New California are signatories to the Amended and Restated Agreement of Purchase and Sale in connection with the Rehabilitation of Executive Life Insurance Company effective August 17, 1991, which constitutes a valid, binding and enforceable contract by, against, and among the signatories thereto. Each party thereto agreed in Article 18.3.1 of that agreement "to do all other acts and things as may be required by law or as may be necessary or advisable to carry out the intent of [the agreement]." Moreover, implied in that agreement was a covenant of good faith and fair dealing, enforceable by, against, and among each of the signatories to that agreement.

96.    New California had and continue to have rights under binding, enforceable contracts, as set forth in the Amended and Restated Agreement of Purchase and Sale and the modified plan of rehabilitation, of which the Agreement is an integral part.

97.    Aurora is a party to the modified plan of rehabilitation, of which the agreement is an integral part.

31

98. Altus breached its covenants, obligations, and/or representations, including but not limited to Article 18.3.1 and the implied covenant of good faith and fair dealing.

99. Such breaches by Altus have proximately caused economic harm to New California and Aurora.

### THIRD DERIVATIVE CAUSE OF ACTION – AIDING AND ABETTING, AND CONSPIRING IN, BREACH OF FIDUCIARY DUTIES BY DIRECTOR JEAN-CLAUDE SEYS TO THE CORPORATION

#### (Against All Defendants Except Pinault)

100. SunAmerica reincorporates by reference the allegations contained in paragraphs 1 through 99 above as though fully set forth herein.

101. Jean-Claude Seys was an officer of MAAF and MAAF Vie responsible for the general management of both entities.

102. Seys was the initial director of New California and a member of its board from 1992 to 1993 and 1998 to 2001, and an initial director of Aurora and a member of its board from 1993 to 1994. Seys knew of the *portages* agreements, but kept them secret.

103. As a result of the conspiratorial relationship between Altus and other Defendants, Seys was effectively subject to control by Altus while acting in his role as the initial director of New California and Aurora.

104. Seys agreed to act at the direction and control of Altus and for its benefit and engaged in a pattern of misconduct in clear breach of his fiduciary duties to New California and Aurora.

105. When the Artémis Defendants joined the conspiracy, Seys continued to breach his fiduciary duties to New California and Aurora in furtherance of the plans of the co-conspirators.

32

106.    Defendants conspired, and knowingly participated, in the breaches of fiduciary duty by Seys, and indeed caused those breaches to occur. Defendants knowingly provided substantial assistance to Seys and directed Seys to continue to disregard the best interests of New California and Aurora and to continue to engage in actions that violated his fiduciary duties to those companies.

107.    As a proximate result of this conduct, New California and Aurora have suffered damages, including attorney's fees and costs to defend the California Fraud Action.

## FOURTH DERIVATIVE CAUSE OF ACTION – AIDING AND ABETTING, AND CONSPIRING IN, BREACH OF FIDUCIARY DUTIES BY ARTEMIS-AFFILIATED DIRECTORS TO THE CORPORATION

### (Against All Defendants)

108.    SunAmerica reincorporates by reference the allegations contained in paragraphs 1 through 107 above as though fully set forth herein.

109.    Defendants aided and abetted, and conspired with, the Artémis-affiliated directors to breach their fiduciary duties to New California and Aurora in order to further Defendants' interests. Through Defendants' improper influence, the Artémis-affiliated directors have unreasonably (a) refused to recuse themselves from decisions relating to the California Fraud Action despite obvious and disabling conflicts of interest; (b) prevented New California and Aurora from initiating claims against Defendants; and (c) prevented New California and Aurora from pursuing overtures by the Commissioner to settle on terms favorable to those companies and conducting settlement discussions with the Commissioner independent of Artémis.

110.    Defendants have knowingly provided substantial financial assistance to the Artémis-affiliated directors and directed these directors to continue to disregard the best

33

interests of New California and Aurora and to continue to engage in actions that violate their fiduciary duties to these companies.

111.    The actions of Defendants have subjected New California and Aurora to damages representing (a) millions of dollars of legal fees in connection with the defense of the California Fraud Action, the Sierra lawsuit, and related government investigations and (b) lost profits. Defendants have also placed New California and Aurora in jeopardy of an adverse judgment for an amount exceeding settlements that New California and Aurora could have entered in the past but for Defendants' interference.

112.    Defendants threaten to continue this improper conduct, and the interests of New California and Aurora are at risk of being imminently and irreparably injured if such action is not taken as is necessary to prevent Defendants from causing further breaches of fiduciary duties by the Artémis-affiliated directors.

### PRAYER FOR RELIEF

SunAmerica, derivatively on behalf of New California and Aurora, prays for judgment as follows:

1.    For compensatory damages to be awarded to New California and Aurora on the causes of action asserted derivatively on their behalf;

3.    For such injunctive relief against Defendants as may be necessary to prohibit further harm to New California and Aurora;

4.    For attorney's fees, costs of suit and expenses incurred herein; and

5.    For such other and further relief as the Court deems just and proper.

34

MORRIS NICHOLS ARSHT & TUNNELL

*Megan Cascio*

Kenneth J. Nachbar (#2067)
Megan Ward Cascio (#3785)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
Attorneys for Plaintiff AIG Retirement
Services, Inc. (formerly known as
SunAmerica Inc.)

OF COUNSEL:

O'MELVENY & MYERS LLP
Marc Feinstein
Mark Holscher
400 South Hope Street
Los Angeles, CA 90071-2899
(213) 430-6000

January 14, 2005

35

EFiled: Jan 14 2005 10:48
Filing ID 4955927

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

AIG RETIREMENT SERVICES, INC.
(formerly known as SunAmerica Inc.),
derivatively on behalf of NEW CALIFORNIA
LIFE HOLDINGS, INC., a corporation
organized under Delaware law, and AURORA
NATIONAL LIFE ASSURANCE COMPANY,
a stock insurance company under California
law;

    Plaintiff,

v.

ALTUS FINANCE S.A., a corporation
organized under French law; AURORA, S.A.,
a corporation organized under French law;
CDR ENTERPRISES, a corporation organized
under French law; CONSORTIUM DE
REALISATION S.A., a corporation organized
under French law; MAAF ASSURANCES, a
mutual insurer organized under French law;
MAAF VIE S.A., a corporation organized
under French law; CREDIT LYONNAIS S.A.,
a corporation organized under French law;
ARTÉMIS, S.A., a corporation organized
under French law; ARTÉMIS FINANCE
S.N.C., an entity doing business under French
law; and FRANCOIS PINAULT, an
individual,

    Defendants, and

AURORA NATIONAL LIFE ASSURANCE
COMPANY, a stock insurance company under
California law; and NEW CALIFORNIA LIFE
HOLDINGS, INC., a Delaware corporation,

    Nominal Defendants.

C.A. No. 1007-N

## MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVER

Plaintiff AIG Retirement Services, Inc., by and through its undersigned counsel, hereby moves this Court, pursuant to Court of Chancery Rule 4, for an Order, in the form attached hereto, appointing any employee of Morris, Nichols, Arsht & Tunnell, or Brandywine Process Servers, Ltd. as a special process server for the purpose of serving the Summons, Complaint and related suit papers requiring service upon the defendants in this action.

The grounds for this Motion are that the appointment of a special process server will result in a material savings of time and expense in the service of process in this action.

MORRIS, NICHOLS, ARSHT & TUNNELL

Megan Cascio

Kenneth J. Nachbar (#2067)
Megan Ward Cascio (#3785)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
  Attorneys for Plaintiff

OF COUNSEL:

O'MELVENY & MYERS LLP
Marc Feinstein
Mark Holscher
400 South Hope Street
Los Angeles, CA 90071-2899
(213) 430-6000

January 14, 2005

2



IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

AIG RETIREMENT SERVICES, INC.                  )
(formerly known as SunAmerica Inc.),           )
derivatively on behalf of NEW CALIFORNIA       )
LIFE HOLDINGS, INC., a corporation             )
organized under Delaware law, and AURORA       )
NATIONAL LIFE ASSURANCE COMPANY,               )
a stock insurance company under California     )     C.A. No. 1007-N
law;                                           )
                                               )
                    Plaintiff,                 )
                                               )
          v.                                   )
                                               )
ALTUS FINANCE S.A., a corporation              )
organized under French law; AURORA, S.A.,      )
a corporation organized under French law;      )
CDR ENTERPRISES, a corporation organized       )
under French law; CONSORTIUM DE                )
REALISATION S.A., a corporation organized      )
under French law; MAAF ASSURANCES, a           )
mutual insurer organized under French law;     )
MAAF VIE S.A., a corporation organized         )
under French law; CREDIT LYONNAIS S.A.,        )
a corporation organized under French law;      )
ARTEMIS, S.A., a corporation organized         )
under French law; ARTEMIS FINANCE              )
S.N.C., an entity doing business under French  )
law; and FRANCOIS PINAULT, an                  )
individual,                                    )
                                               )
                    Defendants, and            )
                                               )
AURORA NATIONAL LIFE ASSURANCE                 )
COMPANY, a stock insurance company under       )
California law; and NEW CALIFORNIA LIFE        )
HOLDINGS, INC., a Delaware corporation,        )
                                               )
                    Nominal Defendants.        )
                                               )
                                               )
                                               )
                                               )

**ORDER**

This _18th_ day of _January_, 2005, upon Motion of the plaintiff, it appearing that the appointment of a special process server pursuant to the Court of Chancery Rule 4 is warranted in this action:

IT IS HEREBY ORDERED that any employee of Morris, Nichols, Arsht & Tunnell or Brandywine Process Servers, Ltd. is appointed special process server for the purpose of serving the Summons, Complaint and related suit papers requiring service upon the defendants in this action.

_____
Master in Chancery

2

SUMMONS



## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

### IN AND FOR NEW CASTLE COUNTY

AIG RETIREMENT SERVICES, INC. (formerly
known as SunAmerica Inc.), derivatively on
behalf of NEW CALIFORNIA LIFE HOLDINGS, INC,
and AURORA NATIONAL LIFE ASSURANCE COMPANY,
                    Plaintiff

VS.
ALTUS FINANCE S.A., AURORA, S.A., CDR ENTER-
PRISES, CONSORTIUM DE REALISATION S.A.,

MAAF ASSURANCES, MAAF VIE S.A., CREDIT LYONNAIS

S.A., ARTEMIS, S.A., ARTEMIS FINANCE S.N.C.,
and FRANCOIS PINAULT,
                    Defendants,

and
AURORA NATIONAL LIFE ASSURANCE COMPANY and
NEW CALIFORNIA LIFE HOLDINGS, INC.,
                Nominal Defendants

CIVIL ACTION NO. 1007-N

SUMMONS

**TO THE**    SPECIAL PROCESS SERVER

**YOU ARE COMMANDED:**

    To Summon the above named defendants so that, within 20 days after service hereof upon

defendants, exclusive of the day of service, defendants shall serve upon

               Kenneth J. Nachbar, Esq.      , plaintiff's attorney whose address is

1201 N. Market Street   P.O. Box 1347   Wilm, DE    an answer to the complaint.
                              19899-1347

    To serve upon defendants a copy hereof and of the complaint.

**TO THE ABOVE NAMED DEFENDANTS:**

    In case of your failure, within 20 days after service hereof upon you, exclusive of the day
of service, to serve on plaintiff's attorney named above an answer to the complaint, judgment by
default will be rendered against you for the relief demanded in the complaint.

Dated  January 19, 2005

*Patricia G. Randolph*
Register in Chancery

CIVIL ACTION NO: 1007-N

AIG RETIREMENT SERVICES, INC. (formerly known as SunAmerica Inc.)

                    Plaintiff

        VS.

ALTUS FINANCE S.A., ET AL

                    Defendant

            SUMMONS

Please effectuate service upon:

    1.  Altus Finance S.A.
    2.  Aurora, S.A.
    3.  CDR Enterprises
    4.  Consortium De Realisation S.A.
    5.  MAAF Assurances
    6.  MAAF Vie S.A.
    7.  Credit Lyonnais S.A.
    8.  Artemis, S.A.
    9.  Artemis Finance S.N.C.
   10.  Francois Pinault
        by serving:

        Secretary of State of Delaware
        Dover, DE  19901

        pursuant to 10 Del.C. §3104

   11.  Aurora National Life Assurance Company
        by serving:

        Insurance Commissioner of Delaware
        841 Silver Lake Blvd.
        Dover, DE  19904

   12.  New California Life
        Holdings, Inc.

        by serving the register
        agent:

        Wilmington Trust Special
        Services
        1105 N. Market Street
        Suite 1300
        Wilmington, DE  19801

SERVICE TO BE COMPLETED BY
SPECIAL PROCESS SERVER

Kenneth J. Nachbar, Esq.

Attorney for Plaintiff

# RETURN OF SERVICE

**CASE NO:**        1007-N

**SERVED:**        AURORA NATIONAL LIFE ASSURANCE COMPANY

**DOCUMENT:**        SUMMONS & COMPLAINT

**ADDRESS:**        C/O INSURANCE COMMISSIONER 841 SILVER LAKE BLVD. DOVER, DE

**DATE:**        3/14/05

## MANNER OF SERVICE

☒    **PERSONAL:**        ACCEPTED BY:   ELIZABETH RIDDICK

☐    **SUBSTITUTE:**

☐    **NO SERVICE:**

_____
GRANVILLE MORRIS

BRANDYWINE PROCESS SERVERS, LTD
PO BOX 1360
WILMINGTON DE 19899
302-475-2600

SWORN TO BEFORE ME ON    3/14/05
_____
NOTARY PUBLIC

KEVIN DUNN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires Nov. 23, 2006

# RETURN OF SERVICE

CASE NO:          1007-N

SERVED:           NEW CALIFORNIA LIFE HOLDINGS, INC

DOCUMENT:         SUMMONS & COMPLAINT

ADDRESS:          WILMINGTON TRUST SPECIAL SERVICES 1105 N. MARKET ST. WILM. DE

DATE:             3/14/05

## MANNER OF SERVICE

☒    PERSONAL:      ACCEPTED BY:   KAREN BILOSKY

☐    SUBSTITUTE:

☐    NO SERVICE:

BARRY EVELAND

BRANDYWINE PROCESS SERVERS, LTD
PO BOX 1360
WILMINGTON DE 19899
302-475-2600

SWORN TO BEFORE ME ON   3/14/05

NOTARY PUBLIC

KEVIN DUNN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires Nov. 23, 2006

# RETURN OF SERVICE

| | |
|---|---|
| CASE NO: | 1007-N |
| SERVED: | ALTUS FINANCE S.A , AURORA, S.A., CDR ENTERPRISES, CONSORTIUM DE REALISATION S.A., MAAF ASSURANCES, MAAF VIE S.A., CREDIT LYONNAIS S.A., ARTEMIS, S.A., ARTEMIS FINANCE S.N.C. & FRANCOIS PINAULT |
| DOCUMENT: | SUMMONS & COMPLAINT |
| ADDRESS: | C/O DELAWARE SECRETARY OF STATE DOVER, DE |
| DATE: | 3/14/05 |

## MANNER OF SERVICE

☒    PERSONAL:    ACCEPTED BY:  SALLIE DAVIS

☐    SUBSTITUTE:

☐    NO SERVICE:

GRANVILLE MORRIS

BRANDYWINE PROCESS SERVERS, LTD
PO BOX 1360
WILMINGTON DE 19899
302-475-2600

SWORN TO BEFORE ME ON   3/14/05

NOTARY PUBLIC

KEVIN DUNN
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires Nov 23, 2006